CAF INVESTMENT COMPANY v STATE TAX COMMISSION

1. TAXATION—PROPERTY TAX—ADMINISTRATIVE DECISIONS—APPEAL
   AND ERROR—EVIDENCE—INCOME CAPITALIZATION—STATE TAX
   COMMISSION—TRUE CASH VALUE—CONSTITUTIONAL LAW—STAT-
   UTES—ERROR OF LAW.
   The Michigan Supreme Court exercises a limited review of ad-
   ministrative decisions regarding the property tax, but a ques-
   tion of whether the income capitalization testimony of the
   State Tax Commission's expert witness may be made a basis for
   the commission's finding of "true cash value" of the property
   being taxed, dealing with the construction of pertinent constitu-
   tional and statutory provisions, warrants full review by the
   Court for alleged "error of law" (Const 1963, art 6, § 28, art 9,
   § 3; MCLA 211.27).

2. WORDS AND PHRASES—TRUE CASH VALUE—FAIR MARKET VALUE.
   The concepts of "true cash value" and "fair market value" in
   Michigan are synonymous.

3. TAXATION—GENERAL PROPERTY TAX ACT—ASSESSMENT—ECONOMIC
   INCOME—TRUE CASH VALUE—ECONOMIC RENT—STATUTES.
   It is not permissible to equate the definition of the statutory term
   "economic income" as found in that section of the General
   Property Tax Act which provides for the determination of "true
   cash value" as used for assessment purposes with the State Tax
   Commission's concept of "economic rent" which proceeds on the
   assumption that the property was available to rent in the
   marketplace and thereby ignoring, for valuation purposes, the
   fact that the piece of property in question is not available in
   the rental marketplace by virtue of existence of a long-term
   lease (MCLA 211.27).

REFERENCES FOR POINTS IN HEADNOTES
[1, 4] 71 Am Jur 2d, State and Local Taxation §§ 458, 603.
[2, 5–7] 72 Am Jur 2d, State and Local Taxation §§ 753, 759 et seq.
[3, 4, 6, 7] 72 Am Jur 2d, State and Local Taxation § 760.
   Income or rental value as a factor in evaluation of real property for
   purposes of taxation, 96 ALR2d 666.
[5] 73 Am Jur 2d, Statutes §§ 272, 274–276.
[8] 72 Am Jur 2d, State and Local Taxation § 803.

4. TAXATION—VALUATION—PROPERTY TAX—ASSESSMENT—LEASE—
   TRUE CASH VALUE—CONSTITUTIONAL LAW—STATUTES.

   To make a valuation for property tax assessment wholly based
   upon an assumption that the property was available in the
   marketplace when the property was subject to a long-term
   lease is unacceptable because the approach bears insufficient
   relation to true cash value as defined by the constitution and
   statute (Const 1963, art 9, § 3; MCLA 211.27).

5. TAXATION—GENERAL PROPERTY TAX ACT—ASSESSMENT—ECONOMIC
   INCOME—TRUE CASH VALUE—FAIR MARKET VALUE—USUAL
   SELLING PRICE—ACTUAL INCOME—CONSTITUTIONAL LAW—STAT-
   UTES.

   The statutory meaning of the term "economic income" must be
   derived from the statutory and constitutional context within
   which the term is used; from this context it is apparent that
   the Legislature intended that "economic income" as found in
   that section of the General Property Tax Act which provides
   for the determination of "true cash value" as used for assess-
   ment purposes would have relation to the definition of the
   "usual selling price" (or fair market value) of property under
   assessment; the term "economic income" as used in the statute
   means actual income (Const 1963, art 9, § 3; MCLA 211.27).

6. TAXATION—STATE TAX COMMISSION—TRUE CASH VALUE—ECONOMIC
   INCOME—RENT—CONSTITUTIONAL LAW—STATUTES.

   State Tax Commission's ultimate determination of true cash
   value, to the extent it is based on testimony of "economic
   income", relies upon a hypothetical rental income without
   consideration of actual rental income demonstrably related to
   fair market value and such valuation does not comport with
   the constitutional and statutory standard of "true cash value"
   (Const 1963, art 9, § 3; MCLA 211.27).

7. TAXATION—ASSESSMENT—VALUATION—INCOME CAPITALIZATION—
   LEASES—RENT—TRUE CASH VALUE.

   A tax assessor, in utilizing the income capitalization approach to
   valuation, is not limited to, and need not accept, the actual
   rental figure under an existing long-term lease as the sole
   measure of projected income and basis for capitalization, be-
   cause in most cases such an approach to true cash value would
   lead to distorted valuation; such factors as the right to reposses-
   sion of the land at the end of the lease, and the length of the
   lease term often suggest that the projected income figure
   should at least in part be adjusted to reflect market conditions;
   it may also be appropriate to adjust the projected income figure

in circumstances where financing was obtained at a much more favorable rate than the current going rate, and there is a high current rate of capitalization, in order to reflect the fact that the income-earning capacity of the property is greater than consideration of the unfavorable long-term lease rental at current capitalization rates would alone suggest; and finally, there may be such facts, peculiar to the circumstances under consideration, as would indicate that the income capitalization approach is too speculative to be a reliable indicator of valuation; in such circumstances the tax assessor may base his assessment upon a more reliable method of valuation.

8. TAXATION—STATE TAX COMMISSION—WITNESSES—CROSS-EXAMINATION—EVIDENCE.

A taxpayer was deprived of its opportunity to effectively cross-examine the State Tax Commission's expert witness with respect to facts which were material to the commission's decision when it was furnished with only part of the witness's report prior to the time the hearing was held before the tax commission; the taxpayer is entitled to a full hearing *de novo* upon remand to the Tax Tribunal.

Appeal from Court of Appeals, Division 2, McGregor, P. J., and Danhof and Bronson, JJ., denying application for leave to appeal from State Tax Commission. Submitted January 8, 1974. (No. 6 January Term 1974, Docket No. 54,709.) Decided September 6, 1974.

C.A.F. Investment Company appealed its property tax assessment for 1971 by defendant Saginaw Township to the State Tax Commission. Assessment affirmed. Court of Appeals denied plaintiff's application for leave to appeal. Plaintiff appeals. Reversed and remanded to the Tax Tribunal for further proceedings.

*Honigman, Miller, Schwartz & Cohn* (by *Jerome M. Salle*), for C.A.F. Investment Company.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, and *Richard R.*

*Roesch,* Assistant Attorney General, for State Tax Commission.

J. W. FITZGERALD, J. At issue in this case is the property tax assessment upon 10.55 acres of land owned by taxpayer C.A.F. Investment Company and leased to the S. S. Kresge Company in 1963 for a 20-year term to be used for a K-Mart store. For purposes of 1971 ad valorem taxes, the assessor for Saginaw Township valued the property at $1,442,-364 and fixed the assessment of $245,300. Property in the township at the time was valued at a percentage rate of 17.04%, resulting in this initial assessment. This assessment was thereafter adjusted by the state equalization factor of 50% of true cash value resulting in a state initial assessment of $721,182. The taxpayer appealed this initial determination to the State Tax Commission.[1]

At the hearing before the tax commission witnesses testified on behalf of both the taxpayer and the tax commission offering estimates as to the true cash value of the subject property ranging from $787,500 to $1,600,000. The State Tax Commission, in a brief opinion which acknowledged the testimony of the tax commission's witness as to a true cash value of $1,440,000, essentially sustained the earlier assessment of the township assessor determining that the true cash value was $1,440,000 and the initial assessment for the township, $245,300.

The taxpayer sought leave to appeal in the

---

[1] While appeal in this case was taken by taxpayer to the State Tax Commission, appeal will henceforth be taken by taxpayers to the Tax Tribunal. This body is by statute made the final agency for property tax administration. MCLA 205.701 *et seq.;* MSA 7.650(1) *et seq.* New proceedings may be commenced before the Tax Tribunal as of September 1, 1974 and heard by that body after October 1, 1974. MCLA 205.779; MSA 7.650(79).

Michigan Court of Appeals, which leave was denied on February 13, 1973. Leave to appeal was thereupon sought from this Court and was granted by order of this Court dated June 20, 1973.

The evidence submitted to the State Tax Commission by expert witnesses was based upon both the capitalization of income method and the depreciated reproduction cost method of property valuation. The property owned by taxpayer was leased to the S. S. Kresge Company for a 20-year term commencing in 1963 and contains three 5-year renewal options at the same rental. The lease is not a "favorable" lease for the lessor under 1971 economic conditions since it carries a low rent reflective of 1963 economic conditions. In submitting evidence of valuation on the capitalization of income method, Dean Nelson, an expert witness for taxpayer, based his valuation upon a rate of return equal to the actual income realized under the "unfavorable" lease and arrived at a valuation of $787,500. Norman Daniels, the staff expert for the commission, on the other hand, based his capitalization of income valuation upon the expected 1971 rental return from comparable properties and arrived at a valuation of $1,600,000.

In its opinion the State Tax Commission noted, among others, the following facts:

"The Commission staff's method of valuation consisted of an appraisal using the reproduction cost approach to value which resulted in a current adjusted reproduction cost of $1,321,900. This value was arrived at by the use of the Marshall Valuation manual along with the commonly accepted appraisal techniques. The land was appraised based upon a study of sales of comparable properties in the Saginaw township area, which resulted in a current true cash value of $274,450. Comparable sales were adjusted where necessary for differences when compared to the subject property.

Total current true cash value of land and improvements is $1,600,000.

"The Commission's staff also made an appraisal utilizing the capitalization of income approach to value, which resulted in a current true cash value of $1,600,-000."

Ultimately the tax commission acknowledged that its conclusion that the true cash value of the property was $1,440,000 was arrived at after "consideration of all the information contained [in the noted facts]".

The principal question of jurisprudential significance on this appeal is whether, under Michigan law, the tax commission was entitled to consider and give weight to evidence of valuation based upon a rate of return which comparable, unencumbered property could earn in the present marketplace in the face of an existing unfavorable long-term lease with an actual rate of return which is substantially less than the present "going rate". A second question raised by taxpayer is whether reversible error was committed when 11 pages of a 17-page report by the commission's examiner were not supplied to taxpayer prior to the hearing before the commission.

I

Article 6, § 28 of the Michigan Constitution of 1963, speaking to the scope of judicial review of administrative decisions regarding the property tax, states in pertinent part:

"In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation."

See, also, MCLA 211.152; MSA 7.210, citing the above as the standard of review in individual assessment cases before the State Tax Commission. The substantial question in this case is whether the income capitalization testimony of the tax commission's expert witness may be made a basis for the commission's finding of "true cash value". While we exercise a limited review of administrative decisions regarding the property tax, such a question, dealing with the construction of pertinent constitutional and statutory provisions, warrants full review by this Court for alleged "error of law".

Article 9, § 3 of the Michigan Constitution of 1963 states:

"The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments. * * * "

The legislative response to the mandate of this constitutional provision is found in MCLA 211.27; MSA 7.27, which provides for the determination of "true cash value", as follows:

"Cash value", means the *usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale.* Any sale or other disposition by the state or any agency or political subdivision of lands acquired for delinquent taxes or any appraisal made in connection therewith shall not be considered as controlling evidence of true cash value

for assessment purposes. In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, zoning, existing use, *present economic income of structures,* including farm structures and present economic income of land when the land is being farmed or otherwise put to income producing use, quantity and value of standing timber, water power and privileges, mines, minerals, quarries, or other valuable deposits known to be available therein and their value.

"Except as hereinafter provided, property shall be assessed at 50% of its true cash value in accordance with article 9, section 3 of the constitution." (Emphasis supplied.)

It is the position of appellant taxpayer that "true cash value" within the meaning of the above provisions can not be determined in reliance upon a rental figure which has no relation to actual rental under an existing long-term lease. Such a rental figure, it is argued, has no reasonable relationship to the "usual selling price" or the fair market value of the property, such being the constitutional and statutory standards for determining true cash value. Appellee State Tax Commission counters by arguing that appellant's actual rental figures posit an unreasonably low capitalized valuation, and furthermore, by adding that the tax commission's valuation approach is justified by the legislative approval of the assessor's consideration of the "present *economic income* of structures" (in MCLA 211.27, *supra;* emphasis added) in determining "true cash value".

In *Allied Supermarkets v State Tax Commission,* 381 Mich 693, 712; 167 NW2d 264 (1969), a majority of this Court, in defining "true cash value", quoted with approval the following from *Helin v Grosse Pointe Twp,* 329 Mich 396; 45 NW2d 338 (1951):

" 'As stated in *Moran v Grosse Pointe Township*
(1947), 317 Mich 248, 254 [26 NW2d 763], the words
"cash value" as defined by CL 1929, § 3415 (CL 1948,
§ 211.27 [Stat Ann 1950 Rev § 7.27]), is the usual selling
price that could be obtained at the time of assessment,
but not the price that could be obtained at a forced or
auction sale. See, also, *Twenty-Two Charlotte, Inc v
City of Detroit* (1940), 294 Mich 275, 283 [293 NW
647].' "

Similar language is incorporated in the definition
of cash value embodied in MCLA 211.27, *supra.*
The concepts of "true cash value" and "fair mar-
ket value" in this state are synonymous.[2]

In the face of constitutional and statutory lan-
guage positing the standard of "true cash value",
the State Tax Commission argues that it is enti-
tled to consider evidence of marketplace rental for
similar properties and ignore the existence of the
long-term lease, because such consideration is jus-
tified by statutory reference to the assessor's con-
sideration of "economic income" in MCLA 211.27;
MSA 7.27.

The appraisal report and hearing testimony of
the sole expert witness for the tax commission,
Norman Daniels, indicates that the tax commis-
sion determined the "economic rent" (as opposed
to the "economic income" as such) of the property.
This witness computed the purported economic

[2] This is not to say that the traditional methods of determining cash
value or true cash value are no longer acceptable. Diverse appraisal
methods are appropriate in determining "usual sales price" (or fair
market value) because many considerations enter into the determina-
tion of sales price.

The methods to be used by the assessor are a matter for decision at
the assessing level in accordance with the language embodied in
MCLA 211.27; MSA 7.27, as amended after the initial decision in
*Fisher-New Center Company [v State Tax Commission,* 380 Mich 340;
157 NW2d 271 (1968)]. Any method for determination of true cash
value which is recognized as accurate and reasonably related to fair
market valuation will fill the statutory prescription and is an accepta-
ble indicator of true cash value.

rent of the property by determining an approximate median percentage which rental per square foot bore to sales per square foot based upon the operations of similar K-Mart properties. The result was a determination of "economic rental" per square foot of $2 per square foot. "Economic rent" is defined as:

"The return for the use of a factor in excess of the minimum required to bring forth its service." Webster's Third New International Dictionary (1964).

In an accurate sense the $2 per square foot figure is not in any respect an "economic rent" figure until rental expenses are subtracted from rental income. Norman Daniels multiplied the $2 per square foot figure by the square footage of the taxpayer's leased premises (107,261 square feet) to arrive at a total marketplace gross income of $214,522 per year. He then subtracted operating expenses of $26,766 to arrive at a total marketplace net income of $187,756 per year. Assuming the taxpayer's property was available to rent in the marketplace, this figure represents the "economic rent" as determined by Norman Daniels' computation. Capitalizing this "economic rent" at the rate of 11.73% rendered the capitalized property valuation of $1,600,000.

The tax commission's position is that determination of "economic rental" (the equivalent of "economic income") in a property tax valuation context may proceed on the assumption that the property was available to rent in the marketplace. The tax commission would have us equate the definition of the statutory term "economic income" as found in MCLA 211.27; MSA 7.27 with their concept of "economic rent" and thereby justify ignoring, for valuation purposes, the fact that the piece of property in question is not available in the rental marketplace by virtue of existence of a

long-term lease. We conclude that such a construction of "économic income" is not permissible.

At the hearing before the State Tax Commission, the taxpayer's cross-examination of Norman Daniels proceeded in part as follows:

"*Q*. And what I am asking, the point I am making is do you have any knowledge that at the time that lease was entered into that it was otherwise a fair and equitable lease based upon conditions which existed at that time, that it was in any way different in terms of rental or other features than those leases which Kresge entered into in 1962?

"*A*. I think it probably, back in 1962, was a fair lease.

"*Q*. So, the owner of the property, in good faith, apparently, made the usual and customary deal with the S. S. Kresge Company at that time, believing that this would be a wise investment?

"*A*. This is possible.

"*Q*. All right. And through the years, it has turned out to be an adverse investment and you agree that this is an adverse investment at this time?

"*A*. It appears to be—

"*Q*. All right.

"*A*. —an adverse investment.

\*     \*     \*

"You have made your investigation as you have now, and you have stated that this is an unprofitable business deal at the present time. You are aware or hypothetically, you have been made aware of the fact that this could continue for at least ten, possibly 25 years, that there is no income being derived at the present time. Did you make a statement earlier that the property would be purchased on the basis of the future income derived from the property?

"*A*. That's the way most investment property is bought and sold.

"*Q*. All right. And you have stated that there is no income?

"*A*. It appears that there is no income from the information I have been furnished. There is income.

"*Q.* There is income?

"*A.* There is income on the property, although it appears—

"*Q.* There is no cash flow?

"*A.* There is no cash flow, yes.

\* \* \*

"I will ask you whether you concur, that a buyer would take into account this actual income stream in purchasing the property?

"*A.* If, as you say, the income stream is frozen for possibly another 25 years [here the remaining period in which the lease was to run plus 3 five-year options to extend], sure, I think it should be taken into consideration.

"*Q.* Right. And the economic rent for the property really can be taken into account only at the expiration of this period when you are free to go and do as you may please?

"*A.* That's true.

"*Q.* All right. And at that time, the economic rent may be substantially higher than any which you even propose?

"*A.* That's true.

"*Q.* But if you used it, would you not have to discount that for the fact that it is not attainable for 25 years at the maximum, ten years at the minimum?

"*A.* That's right."

By this testimony Norman Daniels acknowledged that the usual selling price ("true cash value" or fair market value) of the taxpayer's property would and, indeed, "should" take into consideration the actual rental of an existing long-term lease. He indicated that the purported "economic income" capitalization approach utilized by the commission was based upon the assumption that the property was available in the marketplace and that the commission's concept of "economic rent" was meaningless, as such concept pertains to the valuation of this particular piece of property, because based upon such an assumption. To make

a valuation wholly based upon such an assumption is unacceptable because the approach bears insufficient relation to true cash value as defined by the constitution and by statute.

Unlike "economic rent", "economic income" is not a well-defined term of art.[3] Given this fact, the statutory meaning of this term must be derived from the statutory and constitutional context within which the term is used. From this context it is apparent that the Legislature intended that "economic income" would have relation to the definition of the "usual selling price" (or fair market value) of property under assessment. The tax commission's construction permits the assessor to contend that actual income relevant to a determination of "usual selling price" may be ignored. If the Legislature intended the construction urged by the tax commission it was incumbent upon that body to make such intention apparent by its choice of statutory language. Given a failure of clear legislative expression in this regard, such a construction is not tenable. We conclude that "economic income" as used in MCLA 211.27; MSA 7.27 means actual income.

The State Tax Commission's ultimate determina-

---

[3] This point is noted in the 1972 annual report of the Michigan Law Revision Commission at pp 39–40, where the Tax Commission's construction of the term "economic income" is criticized as follows:

"While 'economic income' is generally deemed to refer to money income or its equivalent, the taxing authorities have contended that it creates a new concept of taking into account hypothetical income which is different than the actual income from the property. It is their contention that if a property is leased under a long term lease for a rental which in later years proves unduly low in the face of changed economic conditions, the taxing authorities can evaluate the property based upon the income which would be received therefrom if there were no lease previously executed. They thus in effect define 'economic income' as the possible income absent a lease, rather than the actual income in the face of a pre-existing lease.

"The term 'economic income' has no such dictionary meaning, nor is it a clearly established term of art."

tion of true cash value of $1,440,000 is based in part upon the testimony of Norman Daniels on "economic income" capitalization. To the extent it is based upon such evidence, the ultimate valuation relies upon a hypothetical rental income without consideration of actual rental income demonstrably related to fair market value. Such a valuation does not comport with the constitutional and statutory standard of "true cash value".

By the holding in this case, we do not mean to suggest that the tax assessor, in utilizing the income capitalization approach to valuation, is limited to, and must accept, the actual rental figure under an existing long-term lease as the sole measure of projected income and basis for capitalization.[4] In most cases such an approach to true cash value would lead to distorted valuation.[5] Such factors as the right to repossession of the land at the end of the lease, and the length of the lease term often suggest that the projected income figure should at least in part be adjusted to reflect current market conditions. It may also be appropriate to adjust the projected income figure in circumstances where financing was obtained at a much more favorable rate than the current going rate, and there is a high current rate of capitalization, in order to reflect the fact that the income-

---

[4] Note, for instance, that "economic income", which we have defined as actual income, is only one of several factors which shall be "considered" by the taxing authority under MCLA 211.27; MSA 7.27 in determining true cash value. The enumerated factors in this statute and other factors demonstrably related to "usual selling price" as defined in the statute may all be considered, when appropriate, by the taxing authority in determining projected "income" for purposes of applying the income capitalization method of valuation.

[5] The instant case is a case in point. Taxpayer's claimed true cash value of $787,500, arrived at by the income capitalization method and based on the actual lease rental is considerably less than the outstanding balance on the mortgage taken out by the taxpayer on the property in 1962. Such a valuation appears unrealistic.

earning capacity of the property is greater than consideration of the unfavorable long-term lease rental at current capitalization rates would alone suggest. Furthermore, we can envision circumstances in which it may be inappropriate to consider lease term rental as a component of projected income.[6] Finally, there may be such facts, peculiar to the circumstances under consideration, as would indicate that the income capitalization approach is too speculative to be a reliable indicator of valuation. In such circumstances the tax assessor may base his assessment upon a more reliable method of valuation.

## II

Taxpayer next contends that its due process rights were violated when only 6 pages of a 17-page report of tax commission examiner Norman Daniels were furnished to taxpayer prior to the time the hearing was held before the tax commission. In an affidavit submitted to the Court of Appeals, taxpayer acknowledged that the first

---

[6] We point out that "consideration" of the enumerated factors under MCLA 211.27; MSA 7.27 does not require that the taxing authority determine projected income under the income capitalization approach upon any one or all of the enumerated factors ("economic" or actual income being one of those factors) so long as the valuation comports with the statute's definition of true cash value as "usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale." "Consideration" of the various factors may well indicate that the application of some or all enumerated factors is inappropriate. For example, in the event lease rental (in statutory parlance a component of "economic income") were not arrived at on the basis of arm's length bargaining or in other respects had no relationship to "usual selling price", as statutorily defined, it would be appropriate for the taxing authority to ignore lease rental as a component of valuation. It is only because in this case the record indicates that long-term lease rental fairly reflects economic circumstances at the outset of the lease term and bears a demonstrable relation to true cash value that we require its consideration.

time it learned that it had been supplied only a partial report by the tax commission was when it obtained the full record of the commission for appeal purposes. Failure to supply the full report in such timely fashion as would permit cross-examination of the commission expert at the hearing before the commission was, it is argued, reversible error.

In *Pavilion Apts v State Tax Commission,* 373 Mich 601; 130 NW2d 399 (1964), this Court concluded that the requirements of due process are not met if the affected party is not afforded an opportunity to know all of the evidence which may be relied upon by the administrative agency in reaching its decision.

In its brief even the tax commission admits that the failure to supply the taxpayer with a full report was an "unfortunate irregularity". We conclude that the taxpayer, by this practice, was deprived of its opportunity to effectively cross-examine the commission's expert witness with respect to facts which were material to the commission's decision. The taxpayer is entitled to a full hearing *de novo* upon remand.

Reversed and remanded to the Tax Tribunal for proceedings consistent with this opinion. No costs, a public question being involved.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH, SWAINSON, WILLIAMS, LEVIN, and M. S. COLEMAN, JJ., concurred with J. W. FITZGERALD, J.